# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3863

_____

| | |
|---|---|
| Robert C. House, | * |
| | * |
| Plaintiff - Appellant, | * |
| | * |
| | *   Appeal from the United States |
| v. | *   District Court for the |
| | *   Southern District of Iowa. |
| Michael J. Astrue, | * |
| | * |
| Defendant - Appellee. | * |

_____

Submitted: April 13, 2007
Filed: September 14, 2007

_____

Before LOKEN, Chief Judge, BYE and RILEY, Circuit Judges.

_____

LOKEN, Chief Judge.

Robert House appeals the district court's[1] order affirming the decision of the Commissioner of Social Security to deny House's application for disability insurance and supplemental security income benefits under Title II, Title XVI, and Title XVIII of the Social Security Act. See 42 U.S.C. §§ 401 *et seq.*, 1381 *et seq.*, 1395c *et seq.*[2]

_____

[1]The HONORABLE CHARLES R. WOLLE, United States District Judge for the Southern District of Iowa.

[2]The same analysis determines disability under Title II and Title XVI. Russell v. Sullivan, 950 F.2d 542, 543 n.2 (8th Cir. 1991). Title XVIII provides health care benefits for persons under 65 entitled to Title II benefits for at least 24 months.

The parties agree that the critical issue on appeal is whether substantial evidence supports the Administrative Law Judge's (ALJ's) decision to give "little weight" to a treating physician's opinions that House cannot tolerate even one hour of prolonged sitting and must have the ability to elevate his legs at least parallel to the ground to avoid worsening the chronic lymphedema condition in his lower left leg. After careful review of the administrative record focused on this issue, we affirm.

House claims that he is disabled from a combination of impairments including chronic lymphedema[3] in his lower left leg, recurrent deep vein thrombosis (clotting) in his legs which has caused pulmonary embolisms, obesity, depression, and borderline intellectual functioning. These conditions severely limit his ability to stand and walk. After a hearing, the ALJ denied the claim. The Commissioner's Appeals Council remanded, primarily for further consideration of the opinions of House's treating physician, Dr. Bret McFarlin, as those opinions might be clarified and supplemented on remand. The ALJ held two additional hearings and again denied the claim, finding that House has severe impairments that leave him unable to perform his past relevant work but is not disabled because he retains the residual functional capacity to perform certain unskilled sedentary jobs such as parking lot cashier, cafeteria cashier, hand packager, and office helper.

The medical evidence in the record reflects that House was hospitalized for three days in March 2001 when he experienced swelling and pain in his lower left leg after working eleven hours the prior day at a construction job. He was bed-rested with the leg elevated and treated with anti-coagulant medications until testing revealed no deep vein thrombosis. Dr. McFarlin stated on a hospital discharge report that House

---

[3]Lymphedema is an abnormal accumulation of lymph fluid in body tissue, caused by disruption of the lymphatic system that normally drains the fluid away. Its effects can range from minimal to incapacitating. The American Medical Association Encyclopedia of Medicine 655 (Dr. Charles B. Clayman ed., 1989).

was fitted for compression hose and told to exercise and change his diet; no work restrictions were noted.

On May 28, 2001, House was hospitalized with shortness of breath from a pulmonary embolism. Dr. McFarlin stated in his discharge report that House was released five days later with a prescription for Coumadin, an anti-coagulant, and a work restriction of "[n]o prolonged standing greater than 1-2 hours." On July 25, he was again hospitalized, this time for six days, for a pulmonary embolism after he stopped taking Coumadin. Dr. McFarlin's discharge report noted that Coumadin was again prescribed and that House was instructed "about his need to keep active." No work restrictions were noted. In September 2001 Dr. McFarlin saw House for a regular monthly follow-up and noted that his lymphedema was chronic but stable.

In a December 2001 Residual Functional Capacity Assessment, Dr. Lawrence Staples noted that House's "left lower extremity lymphedema was stabilizing." Dr. Staples opined that House could lift twenty pounds occasionally and ten pounds frequently, could stand or walk six hours and sit six hours in a work day, and was therefore "capable of work activities."

In a June 2002 disability letter, Dr. McFarlin described House's treatment since March 2001 and opined that House had "severely limited range of motion and ability to ambulate, stand for extended periods or time, or bear any significant weight on his left lower extremity." Dr. McFarlin noted that lymphedema "is a permanent, irreversible state with no satisfying therapy" and therefore House "will be doomed to a life of anticoagulation therapy and a limited physical activity." In July, Dr. McFarlin's notes from a periodic check-up stated:

> Lymphedema, this appears to be a permanent, irreversible, disabling condition for this individual, greatly limiting his ability to ambulate or pursue meaningful levels of activity. Even two hours of mostly sedentary but standing work will greatly increase his symptoms and

diminish his ability to ambulate without assistance. I have encouraged him to again pursue a disability application.

In November 2002, another physician in Dr. McFarlin's clinic noted that House was "doing very well." He had lost weight, there was less swelling in his left leg, and he was walking and exercising more. In December, House sprained his ankle while raking leaves. In January 2003, his physical therapist noted he was walking without difficulty, except for the sprained ankle, and was on a home exercise program for strength and cardiovascular fitness. In March 2003, House reported no changes in left leg swelling and said he tries to keep his legs elevated as much as possible. In August 2003, he told a physician's assistant that his left calf hurt if he danced or walked a lot.

On September 29, 2003, Dr. McFarlin wrote the Iowa Division of Vocational Rehabilitation that House suffers from a "chronic and permanent disabling condition," explaining that recurrent deep vein thrombosis required "a lifelong course of anticoagulation" and severe lower left leg lymphedema caused swelling and pain that "will greatly limit Mr. House's ability to perform any meaningful act of employment that might involve walking, standing, ambulating, or lifting to any significant degree." However, Dr. McFarlin added, it is "not unrealistic to think" that House could perform "a sedentary occupation" without worsening his health problem.

House was hospitalized for pneumonia in January 2004. Dr. McFarlin's discharge report stated that House could return to work. At a May 2004 six-month check-up, House reported no pain in his legs, which he felt were staying the same size. Dr. McFarlin described the lymphedema as stable.

In June 2004, Dr. McFarlin responded to a request from House's attorney "to clarify prior descriptions" of House's condition. Dr. McFarlin wrote that his prior use of the word "sedentary" did not mean the Social Security definition, but rather that House "could not be expected to spend significant periods of time ambulating,

-4-

standing upright, *or sitting* without aggravating the lymphedema" (emphasis added). Dr. McFarlin then opined that House could not tolerate an eight-hour workday with "any periods of lifting, standing, sitting, or walking for periods of time measured even in multiple minutes, let alone hours." A job involving prolonged periods of sitting "would necessitate a special prosthetic chair with the ability to elevate legs."

At the November 2004 supplemental hearing, the vocational expert testified that he had never seen a "special prosthetic chair" in the workplace. He opined that the need to elevate one's legs to waist-level or higher "would preclude employment," but the need to raise House's legs onto a box underneath his feet "could be accommodated." After the hearing, House submitted a second letter from Dr. McFarlin explaining that his reference to a special prosthetic chair was not intended to prescribe a specific chair. "Ideally," Dr. McFarlin opined, House's left leg "would be elevated as much as possible . . . at least parallel with the ground" in a chair whose capacity equaled or exceeded House's substantial weight. In concluding, the letter stated Dr. McFarlin's intent "to clarify and reiterate my strong belief that Mr. House is a legitimate candidate for long term and permanent disability."

The ALJ's lengthy opinion described House's extensive medical history and his subjective complaints in detail. In determining residual functional capacity, the ALJ gave significant weight to Dr. McFarlin's opinion that House has "severe limitations in his ability to stand or walk." However, the ALJ gave little weight to Dr. McFarlin's opinions that prolonged sitting, "measured in terms of minutes, not hours," and the inability to elevate his legs at least to waist level while working would exacerbate House's leg problems. These opinions, the ALJ explained, were not supported by the medical evidence and House's own testimony, which indicate that House's lower leg condition will not be exacerbated if he is employed at a sedentary job where "he is allowed to get up and move around every ½ to one hour during the day." The ALJ then found that House's severe leg impairments preclude him from performing his past relevant work and many work-related tasks, but he retains the residual functional

capacity to lift and carry up to twenty pounds occasionally and ten pounds frequently, to sit for thirty to sixty minutes at a time for about six hours in an eight-hour work day, and to stand or walk a total of about two hours in an eight-hour work day. The ALJ credited the vocational expert's testimony that a person with these abilities can perform certain sedentary jobs which exist in significant numbers in the national economy, including parking lot cashier, cafeteria cashier, hand packager, and office helper. Accordingly, House was not disabled.

A treating physician's opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quotation omitted). However, while entitled to special weight, it does not automatically control, particularly if "the treating physician evidence is itself inconsistent." Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995); see Wagner v. Astrue, No. 06-3580, slip op. at 10-11 (8th Cir. Aug. 24, 2007); Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005). Here, the inconsistencies are profound. In treatment notes and hospital discharge reports, Dr. McFarlin noted a work limitation on "prolonged standing greater than 1-2 hours" only once, after a May 2001 pulmonary embolism, and he opined in September 2003 that House could perform sedentary work. Dr. McFarlin consistently described the lymphedema condition as stable and as being aggravated by standing or walking, not by sitting. His July 2002 treatment notes, for example, reported that "[e]ven two hours of mostly sedentary but standing work will greatly increase his symptoms and diminish his ability to ambulate without assistance." By contrast, when writing House's attorney in June 2004 after the Appeals Council remand, and in November 2004 following the supplemental hearing, Dr. McFarlin for the first time opined that prolonged sitting will exacerbate the lower left leg lymphedema and only elevating House's leg above waist level in a special chair will avoid exacerbating that condition. As Dr. McFarlin had been urging House to seek disability benefits since before June 2002, the ALJ had good reason to discount the new inconsistent opinions that House lacked the capacity

to engage in sedentary occupations that require prolonged sitting. These opinions were rather obviously based upon Dr. McFarlin's understanding of the relevant disability criteria, not on medical evidence. A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination. See Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002).

In addition, other substantial evidence in the record supports the ALJ's decision to discount these opinions. A disability report House completed soon after he applied for disability benefits in July 2001 stated that he had problems standing and walking but made no mention of sitting. That same month, he was hospitalized for a second pulmonary embolism after failing to take his prescribed medication; a doctor told him he needed to keep active. In a November 2001 Social Security questionnaire, House stated that he could stand or sit for two hours and walk half a mile. House testified that, from 2001 through 2003, he worked four hours per day, twenty hours per week, cooking lunch for four or five people at the rescue mission where he lived. As we noted in Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005), this is "substantial, indeed compelling, evidence inconsistent with [Dr. McFarlin's] assessment." House also received assistance from the Iowa Division of Vocational Rehabilitation Services beginning in August 2003; the agency's records report that he was actively looking for work between February and June 2004. In September 2004, he told a psychologist that he wanted to get back into the job market and could stand for a couple of hours per day. At the hearing, House testified that he currently spends most of his days sitting, standing, or walking. He testified that he can sit for up to thirty minutes at a time and then has to stand up and walk around. His current job at the rescue mission involves cleaning rooms, and he climbs stairs, with some difficulty, to his room on the second floor.

After careful review, we conclude that substantial evidence supports the ALJ's findings giving little weight to Dr. McFarlin's opinions regarding House's inability to

tolerate prolonged sitting and the need to elevate his legs to waist level during a work day. The medical evidence reflects that elevating his lower left leg alleviates swelling and that prolonged periods of elevation in the hospital were needed when House suffered severe swelling after working eleven-hour days at construction or failing to take his prescribed medication and to remain active. But the issue is whether his chronic lymphedema could tolerate a sedentary job at which his legs would be elevated with a box under his feet, he would be able to get up and walk around after one-half hour to one hour of sitting, and he could elevate his legs to waist level during breaks, lunch periods, in the evenings, and on weekends. The evidence on this issue is mixed, and our task is to determine whether the Commissioner's decision is supported by substantial evidence on the administrative record as a whole, not to substitute our fact-finding for the Commissioner's. When substantial evidence supports the Commissioner's findings and conclusion, we may not reverse because substantial evidence would also support the opposite conclusion. See Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).

Accordingly, the judgment of the district court is affirmed.

BYE, Circuit Judge, dissenting.

I respectfully dissent as I do not believe there is substantial evidence in the record to support the administrative law judge's (ALJ's) rejection of the treating physician's opinion regarding Robert House's need to elevate his legs as much as possible during the day.

The ALJ gave two reasons for rejecting the treating physician's opinion regarding House's need to elevate his legs. Specifically, the ALJ said:

> There is nothing in the record to support Dr. McFarlin's assertion that the claimant's left lower extremity lymphedema will be exacerbated if he

cannot elevate both of his legs throughout the day. More importantly, the medical evidence indicates that the claimant developed recurrent deep vein thrombosis and pulmonary embolism in June 2001 because he stopped taking Coumadin, not because he did not spend most of the day with his legs elevated (Exhibit 6F). Since the June 2001 hospitalization, the claimant has been taking Coumadin faithfully and he had not developed further deep vein thrombosis or pulmonary embolism. Finally, the claimant did not testify that he needed to elevate his legs during the day. It is clear that the statements of opinion were manufactured for the purpose of this adjudication, and are not well supported by the clinical findings and/or laboratory studies (20 CFR 404.1527(d), 416.972(d)).

Administrative Record at 22.

Thus, the two reasons the ALJ gave for rejecting the treating physician's opinion on House's need to elevate his legs were: (1) House was hospitalized because he failed to take his Coumadin, not because he was not elevating his legs; and (2) House did not testify he needed to elevate his legs.

The ALJ's first reason simply does not support the conclusion House does not need to elevate his legs. The only conclusion that follows from the fact House was hospitalized for failure to take his Coumadin is House will require hospitalization if he fails to take his Coumadin. The issue whether he should also elevate his legs is an entirely separate matter.

The second reason given by the ALJ is not supported by substantial evidence in the record. In fact, the record indicates just the opposite – House specifically testified he needs to – and does – elevate his legs:

Q.    About how long can you sit?
A.    Usually 20 minutes. If I try, I can sit 30 at the most.

-9-

Q. And then after 20 minutes, what happens?
A. I have to get up and stand and walk around.
Q. **If you're sitting down, do you need to have your legs elevated?**
A. **Yes.**
Q. **All the time or - -**
A. **Supposed to be, but I try to elevate them as much as possible.**

Administrative Record at 524 (emphasis added).

House also testified he elevates his leg while driving:

Q. Do you have that pain all the time or does it come and go?
A. It's pretty much all the time. I got to keep moving my leg and even when I drive I have to keep picking my leg up and moving it.

Id. at 546.

When the ALJ asked House about his daily activities, such as cooking and cleaning at the mission, the ALJ did not ask House whether he took breaks to elevate his legs.

In sum, I do not believe there is substantial evidence in the record to support the ALJ's rejection of the treating physician's opinion about House's need to elevate his leg during a typical work day. The record indicates House may have to amputate his leg if his lymphedema does not improve. The record also indicates a failure to elevate his leg aggravates the lymphedema. Because the adverse consequences of House's lymphedema could be severe, I believe this is an issue which should be looked at more closely in a further hearing after additional information is developed on whether and how often House needs to elevate his legs during a typical work day.

-10-

For the reasons stated, I would reverse and remand for additional consultative exams to be performed to address House's need to elevate his legs during the work day.

_____