# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-3240

_____

Tracy Milam

*Plaintiff - Appellant*

v.

Carolyn W. Colvin, Acting Commissioner, Social Security Administration

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: April 13, 2015
Filed: July 24, 2015

_____

Before BYE, BEAM, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Tracy Milam appeals the district court's[1] affirmance of an Administrative Law Judge's (ALJ) denial of Milam's application for social security disability insurance benefits. We affirm.

## I. *Background*

Milam applied for disability insurance benefits on July 12, 2011. She identified her disability onset date as August 31, 2009—the same day her employer laid her off. Prior to the layoff, Milam had worked for 20 years, most recently as a secretary/administrative assistant. Milam alleges that she is now totally disabled because of back pain, knee pain, hip pain, and osteoporosis.

### A. *Milam's Medical History*

On August 6, 2007, Milam visited Dr. Brent Sprinkle, D.O., complaining of "[c]ervical pain, some low back pain, [and] intermittent tingling." Dr. Sprinkle tested both her upper and lower extremities and found no significant limitation in range of motion, no evidence of instability, no gross misalignments, and no strength deficits. He also tested her neck and upper spine and found no strength deficits and no significant limitations on flexion, extension, rotation, or side-bending. His examination of her lumbar spine, however, revealed decreased motion and thoracic scoliosis. Dr. Sprinkle ultimately diagnosed "[i]diopathic scoliosis status post fusion in the 1970s."[2]

Dr. Sprinkle then ordered an MRI of Milam's cervical spine. The MRI revealed a "straightening of the cervical spine without sublaxation" and that Milam's "cervical

[1]The Honorable Jerome Kearney, United States Magistrate Judge for the Eastern District of Arkansas, to whom the parties consented to refer the case under 28 U.S.C. § 636(c).

[2]A Harrington rod was implanted along Milam's spine in 1976 to treat her scoliosis.

cord [was] normal in signal throughout." The MRI indicated that "[m]ild disc/osteophyte complex[es]" were causing "minimal" or "mild" canal narrowing at the C3-C4, C4-C5, and C6-C7 discs. The MRI likewise indicated that "[b]road disc/osteophyte complex[es were] caus[ing] mild to moderate canal narrowing, and appear[ed] to contact the anterior cord. . . . Mild indentation of the anterior cord [was] noted without signal abnormality."

Milam returned to Dr. Sprinkle on August 16, 2007. He diagnosed cervical degenerative disc disease. He opined that Milam's "pain is more muscle spasm related since about two minutes post trigger point injection her pain was considerably reduced."

Milam visited Dr. Sprinkle again on September 14, 2007. Dr. Sprinkle administered a trigger point injection, prescribed Zanaflex (a muscle relaxant) and Ultram ER (a pain reliever), and recommended a return visit in three to four weeks.

When Milam returned to Dr. Sprinkle on October 12, 2007, Dr. Sprinkle noted that the trigger point injection "seem[ed] to have made a huge difference" and that Milam was "not taking the Zanaflex." He then cleared her to return to work.

Milam did not seek treatment from Dr. Sprinkle again for her back pain until June 3, 2011—nearly four years later, and nearly two years after she claims she became disabled. During this visit, Milam informed Dr. Sprinkle that she "want[ed] to pursue disability." Dr. Sprinkle's exam revealed no strength deficits, no instability, and no significant loss of range of motion except for a certain "decreased range of motion" in her lumbar spine. He also noted "[d]iffuse myofascial trigger points" and "bilateral lumbar paraspinal trigger points." An x-ray showed that "previous spinal hardware for thoracic scoliosis . . . appear[ed] to be in good position" and that "some mild degenerative is above and below her hardware." Milam was "concerned that her pain [had] progressed," and Dr. Sprinkle noted "some progression of degenerative

changes . . . above and below the level of her hardware infusion." Dr. Sprinkle opined that Milam could not "tolerate sedentary work that requires prolonged sitting." Dr. Sprinkle noted during the same visit, however, that Milam "has a moderate activity level. Exercise includes walking and weights. Exercises 3–4 times a week. Exercises 0–5 hours per week." He recommended that she continue the "home exercise program" and return for treatment "as needed."

About this time, Milam began keeping a "Pain and Function Journal." She continued making periodic entries until September 26, 2012. Milam's periodic entries generally noted that she experienced pain, headaches, stiffness, shortness of breath, and fevers. She usually rated her pain on a zero-to-ten scale. She rated her pain somewhere between zero and six on the significant majority of days in which she recorded any pain; in contrast, she rated her pain as a nine or ten only three times throughout the approximately 16-month period.

On June 17, 2011, Milam visited Dr. David Shenker, M.D., at a women's clinic to obtain an annual examination. She denied, among other things, any tingling, numbness, muscular weakness, joint pain, joint swelling, or difficulty sleeping.

Dr. Steven Strode, M.D., completed a Physical Residual Functional Capacity Assessment of Milam on September 10, 2011. He concluded that Milam could stand or walk for approximately six hours in an eight-hour workday. He also concluded that she could sit for approximately six hours in an eight-hour workday; frequently lift or carry up to ten pounds; occasionally lift or carry up to 20 pounds; frequently climb stairs or ramps; and occasionally climb ladders, balance, stoop, kneel, crouch, or crawl. He noted that Milam "[c]ooks, cleans, does laundry, walks, drives, goes out alone, and shops in stores." A case analysis performed by Dr. Jerry Thomas, M.D., on November 15, 2011, reached the same conclusions with respect to Milam's limitations.

On November 9, 2011, Dr. Bruce Randolph, M.D., performed a consultative general physical examination of Milam. He diagnosed Milam with scoliosis, chronic back pain, and arthritis. He also noted that she had normal range of motion in her shoulders, hips, knees, and spine and had only "moderate limitation in standing, walking, climbing, squatting, lifting and carrying."

On March 26, 2012, Dr. Sprinkle saw Milam and recorded that she could not "tolerate hardly any bending[,] lifting[,] twisting[,] or walking[,] or standing to a significant degree." He noted no significant changes in range of motion, stability, or strength. He recommended that she take or continue taking Skelaxin (a muscle relaxant) and NSAIDs (non-steriodal anti-inflammatory drugs), deferred her injections, and advised her to return for treatment as needed.

Three months later, on June 28, 2012, Milam returned to Dr. Sprinkle for further assessment. Dr. Sprinkle noted that Milam was feeling pain and that "[t]here are no relieving factors." He also noted that Milam was pursuing "disability because of her inability to tolerate primarily prolonged sitting or standing or bending or twisting and heavy lifting as a result of her diffuse cervical thoracic and lumbar degenerative disease and scoliosis and Harrington rod placement." Later that same day, however, he wrote a letter "To Whom It May Concern" stating that Milam "may return to work," provided she did not bend, twist, lift more than ten pounds, or stand or sit for prolonged periods of time.

Finally, on October 30, 2012, Dr. Sprinkle completed a Functional Capabilities Assessment in which he opined that Milam could frequently lift less than ten pounds, occasionally lift ten pounds, stand or walk for less than two hours in an eight-hour workday, and sit for less than two hours in an eight-hour workday.

B. *ALJ Hearing and Decision*

At Milam's request, an ALJ conducted a hearing regarding Milam's application on October 26, 2012. With respect to her prior employment, Milam testified that her employer laid her off as part of a reduction in work force. The ALJ noted on the record his general suspicions about claimants who are "laid off—they work until the last day and then all of a sudden they're disabled." He also observed that, after Milam's layoff and alleged disability onset date, she sought and received unemployment benefits and even looked for a new job.

Milam testified at the hearing that she can drive for only 20 minutes without back and hip pain, can sit for only 30 minutes continuously before needing to stand due to pain, can lift up to five to ten pounds, has limited ability to bend her back, and has difficulties rotating and squatting. She testified that she is in pain "24/7 on a good day" and sleeps an average of four to five hours per night. She submitted letters from three former coworkers stating, among other things, that Milam was absent from work up to five days per month.

Milam also testified about her daily activities. She confirmed that she cooks for up to 20 minutes every day, does laundry, showers on her own, and shops for groceries. She occasionally uses a walker or a cane that her mother gave her, although no physician ever prescribed that she use them.

The ALJ then posed two hypothetical scenarios to the vocational expert (VE) present at the hearing. The first hypothetical consisted of a person similar to Milam in terms of age and work experience who had mild to moderate pain; could sit for only four to six hours in an eight-hour workday; could stand for only two to three hours in an eight-hour workday; could sit or stand continuously for only 30 minutes at a time; could occasionally climb, stoop, crouch, kneel, and crawl; and would have to miss one or two workdays every month. The second hypothetical consisted of a

similar person who had to miss three to five workdays per month due to moderate to severe pain.

The VE testified that the person in the first hypothetical could perform Milam's past work as a secretary/administrative assistant but that the person in the second hypothetical could not find employment due to excessive absenteeism. According to the VE, "generally when you miss two days or 10 percent on a consistent basis employers would not tolerate it; however, on[e] day a month . . . for a long-term employee—employers would tolerate that, your honor." Milam then testified that she missed, on average, three to five workdays every month.

The ALJ ultimately found that Milam was not disabled and issued a written decision denying Milam's claim. The ALJ found that Milam could perform sedentary work with the following restrictions:

> [She can] sit no more than 4–6 hours and stand no more than 2–3 hours in an eight-hour workday. The claimant can stand or sit for up to thirty minutes at a time and then requires the option to sit or stand at will. She can occasionally climb, stoop, crouch, kneel and crawl. The claimant's symptoms, including pain, will cause her to miss 1–2 days of work per month.

C. *Procedural History*

Milam appealed the ALJ's decision to the Social Security Administration's Appeals Council. The Appeals Council denied her request for review, finding no "basis for changing the [ALJ]'s decision."

Milam subsequently sought review of the ALJ's denial of benefits in the district court. The district court affirmed, however, finding that substantial evidence on the record as a whole supports the ALJ's decision.

II. *Discussion*

On appeal, Milam argues that substantial evidence in the record as a whole does not support the ALJ's decision because the ALJ (1) improperly discredited Dr. Sprinkle's opinion; (2) improperly discredited Milam's subjective complaints; and (3) improperly relied on VE testimony that, according to Milam, does not support the ALJ's decision.

We review de novo the district court's decision upholding the ALJ's denial of social security benefits. *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006). We will affirm the denial if substantial evidence in the record as a whole supports the ALJ's decision. *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010). Substantial evidence is "less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (alteration in original) (quotation omitted). "We must consider evidence that both supports and detracts from the ALJ's decision, but we will not reverse an administrative decision simply because some evidence may support the opposite conclusion." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quotations and citations omitted). Indeed, we must affirm the denial of benefits if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings." *Id.* (quotations and citations omitted).

A. *Dr. Sprinkle's Opinion*

Generally, "[a] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *House v. Astrue*, 500 F.3d 741, 744 (8th Cir. 2007) (quotation and citation omitted). "A treating physician's own inconsistency may [] undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). In this case, Dr. Sprinkle's

opinion that Milam is unable to work is not only "inconsistent with the other substantial evidence," it is also inconsistent with his own treatment and notes.

First, Dr. Sprinkle's opinion that Milam "may return to work" with certain restrictions does not comport with his opinion that Milam could neither stand nor sit for a total of even two hours per workday. His opinion that Milam "may return to work" does comport, however, with the opinions of *three* other physicians who independently evaluated Milam's impairments in late 2011 and concluded that she had only moderate limitations. Dr. Strode, for instance, concluded that Milam could stand or walk for approximately six hours per eight-hour workday and could likewise sit for approximately six hours per eight-hour workday. Dr. Thomas agreed with this assessment. Similarly, Dr. Randolph noted that Milam had only "moderate limitation in standing, walking, climbing, squatting, lifting and carrying." These medical opinions cast significant doubt on Dr. Sprinkle's opinions, particularly when considered in light of Dr. Sprinkle's own belief that Milam "may return to work." *Id.; Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) (holding that the ALJ properly discounted a treating physician's opinion when it was inconsistent with his own treatment notes, as well as other medical opinions).

Moreover, Milam's regular physical activities further undermine Dr. Sprinkle's opinion that Milam could neither stand nor sit for a total of two hours per workday. Indeed, as Dr. Sprinkle noted on June 3, 2011, Milam "has a moderate activity level," her "[e]xercise includes walking and weights," and she "[e]xercises 3-4 times a week" for up to "5 hours per week." Dr. Sprinkle also recommended she continue the "home exercise program." In addition to Milam's exercise regimen, Milam regularly cleans her home, cooks for her family, cares for her pets, pays bills, does laundry, drives a car, shops for groceries and clothing, attends church, visits family, plays computer games, watches television, and so forth. Milam even represented in her Function Report that she cleans, cooks, and does laundry for approximately "4 hours" per day. To be sure, a claimant's ability to engage in "personal activities such as cooking,

cleaning, and hobbies" does not preclude a finding that the claimant is disabled. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (citation omitted). In this case, however, Milam's regular activities support the ALJ's discounting of Dr. Sprinkle's opinion "given both the extent of [Milam's] daily activities and the independent medical evidence that she was not totally disabled." *Ponder v. Colvin*, 770 F.3d 1190, 1196 (8th Cir. 2014) (citations omitted); *see also Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007) (upholding a denial of disability benefits in part because the claimant "engaged in extensive daily activities, such as fixing meals, doing housework, shopping for groceries, and visiting friends").

In sum, given Dr. Sprinkle's opinion that Milam could return to work; the opinions of Dr. Strode, Dr. Thomas, and Dr. Randolph; and Milam's regular physical activities, we conclude that substantial evidence in the record as a whole supports the ALJ's decision to discredit Dr. Sprinkle's opinion.

## B. *Milam's Subjective Complaints*

"Where objective evidence does not fully support the degree of severity in a claimant's subjective complaints of pain, the ALJ must consider all evidence relevant to those complaints." *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). This includes evidence pertaining to "the claimant's daily activities"; "the duration, frequency and intensity of the pain"; "precipitating and aggravating factors"; "dosage, effectiveness and side effects of medication"; and "functional restrictions." *Polaski*, 739 F.2d at 1322. Of course, "[t]he ALJ need not explicitly discuss each *Polaski* factor. It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) (internal citations omitted). "The ALJ may discount complaints of pain if they are inconsistent with the evidence as a whole. If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even

if every factor is not discussed in depth." *Perkins*, 648 F.3d at 900 (quotations and citations omitted).

The ALJ identified multiple valid reasons for discrediting Milam's subjective complaints of pain, including Milam's application for and receipt of unemployment benefits after she allegedly became disabled. In seeking and obtaining such unemployment benefits, Milam evinced a willingness and ability to work, which contradicts her claim of disabling pain. *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991) ("A claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold [her]self out as available, willing and able to work." (citation omitted)). Milam's search for a new job after her layoff further evinces both a willingness and ability to work after she allegedly became disabled.

The ALJ also noted Milam's relatively conservative treatment history, which relied on "a conservative course of treatment, including exercises, . . . and medication." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (footnote omitted) (citation omitted). Moreover, Milam did not seek medical treatment for her alleged pain for long periods of time. In the nearly *four years* between September 2007 and June 2011, for instance, Milam did not seek any medical treatment from Dr. Sprinkle for her back pain—notwithstanding her assertion that she actually became disabled in August 2009. *See Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997) (holding that a claimant's "failure to seek medical assistance for her alleged . . . impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits" (citations omitted)).

Milam's regular physical activities, as discussed above, further undermine her assertion that she is unable to perform even sedentary work. Of course, "the ability to do activities such as light housework and visiting with friends" alone are insufficient reason to discredit Milam's subjective complaints. *Baumgarten v. Chater*,

75 F.3d 366, 369 (8th Cir. 1996) (quotation and citations omitted). But the extent of Milam's regular physical activities, particularly when considered in conjunction with the medical record in this case, further supports the ALJ's decision. *See, e.g., Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) (finding that the claimant's ability to shop, drive short distances, attend church, and visit relatives was inconsistent with her assertion of disabling pain); *Lawrence v. Chater*, 107 F.3d 674, 676 (8th Cir. 1997) (finding that the claimant's ability to "dress and bathe herself," and "do some housework, cooking, and shopping" contradicted her "testimony regarding the severity of her pain and disability").

The ALJ also considered, among other things, Milam's work history. Milam is correct that her "lengthy work history supports her subjective complaints of disabling pain." *Black*, 143 F.3d at 387. "[O]ffsetting this work history[, however,] is the fact that [Milam] was laid off from her position, rather than forced out due to her condition." *Id.* (citation omitted).

In light of the foregoing considerations and the record as a whole in this case, we find that substantial evidence supports the ALJ's adverse credibility determination.

## C. *VE's Testimony*

The ALJ found Milam was not disabled in part because the VE testified Milam could perform her prior work as a secretary/administrative assistant. As discussed above, the VE's testimony was based on a hypothetical scenario in which a person similar to Milam missed one or two workdays per month. Milam takes issue with this hypothetical in part because she contends her impairments require her to miss up to five workdays per month. The ALJ specifically found, however, that the objective medical evidence did not support a need to miss more than one or two workdays per month. We find no error in the ALJ's hypothetical. *See Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) ("The ALJ's hypothetical question need include only those impairments that the ALJ finds are substantially supported by the record as a whole."

-12-

(quotations and citations omitted)). And we further find that the VE's testimony constitutes substantial evidence supporting the ALJ's determination that Milam could perform her past work. *Id.* ("Testimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence." (citations omitted)).

Milam also seemingly argues that the VE's testimony should be interpreted to mean that an employer would never tolerate two absences in any given month. We disagree. The VE made clear that she was testifying about absenteeism "on a consistent basis." The ALJ's hypothetical to the VE assumed only that Milam would miss *up to* two workdays per month—not that Milam would *consistently* miss two workdays per month, or even that Milam would *usually* miss two workdays per month.

### III. *Conclusion*

In sum, the ALJ's decision is supported by substantial evidence on the record as a whole. We affirm.

BYE, Circuit Judge, dissenting.

I disagree with the majority's characterization of the evidence regarding Milam's consistent absenteeism and the ALJ's, at best, unclear resolution of the issue. I believe the case should be remanded to the ALJ for further development on the issue.

The Vocational Expert ("VE") testified that "in terms of an absenteeism, . . . generally when you miss two days or 10 percent on a consistent basis[,] employers would not tolerate it; however, on[e] day a month for [Milam's position] for a long-

term employee—employers would tolerate that."[3]  Milam immediately spoke up and said she "missed an average of three to five days a month" during her previous employment.  The ALJ said he would "leave the record open for the absentee records" to determine how many days she missed on average and then based on her employment records would make a credibility determination as to how many days she actually missed.  When Milam was unable to acquire her prior work records without a subpeona and requested a subpeona, the ALJ changed his mind and concluded that the issue was "not material to the resolution of her claim" because even if she missed three to five days per month, he did not believe based on the objective medical evidence that she had impairments that would cause her to miss work at this rate.  He believed, based on her impairments and pain, she would miss "1-2 days of work per month."  The district court recognized that the ALJ erred in finding Milam could still find work by having to consistently miss one to two days per month but found the error harmless because her prior employer accommodated her need for absences.

First, I think the ALJ erred in finding immaterial the issue of how many days Milam missed per month.  If Milam would be expected to miss three to five days per month because of her pain from her impairments, it is undisputed she would be unemployable.  In addition to Milam's own reports of pain and need to miss three to five days of work per month during her prior employment, three of her former co-workers submitted letters explaining how much pain Milam was consistently in while at work and how much time she consistently missed.  Her manager from 1988 to 1998 explained that Milam "consistently was forced to miss work and [was] many times

---

[3]This testimony is consistent with testimony from vocational experts in past cases.  See, e.g., Hacker v. Barnhart, 459 F.3d 934, 942 (8th Cir. 2006) (Heaney, J., dissenting) (noting testimony from the vocational expert that "if Hacker missed more than two days of work per month, her absenteeism would render her unemployable"); Douglas v. Bowen, 836 F.2d 392, 396 (8th Cir. 1987) (noting testimony from vocational expert that claimant would be unemployable if he "had an absentee rate in excess of one *or* two days a month" (emphasis added)).

in a great deal of pain while at work." She estimated that "[o]n average, [Milam] missed 1 to 2 days per month due to back pain." She believed Milam "would have missed more, but many times, though suffering[,] she would force herself to come to work just to maintain her job." A different manager provided that during the six years they worked together, Milam "was absent from work 3 to 5 days a month due to severe back pain." During this time, her employer also "made special provisions for her in her work area in an attempt to alleviate some of her back pain and discomfort." Her other co-worker also explained that during 2003 to 2010, she observed Milam in "severe back pain at work," not being able to stand up straight, and sometimes in tears because of the pain. She stated that Milam would be asked to go home because of the pain an average of five working days per month, sometimes in three consecutive days. She also noted that her employer attempted to make her "work space as comfortable as possible for her," including providing her with a "special desk that she could move her monitor up and down" and a "special chair."

The ALJ disregarded all of this evidence and failed to develop the record further, all because he did not believe the objective medical evidence before him would support a conclusion that Milam should miss so much time from work. It is undisputed, and the ALJ found, that Milam suffered from several back-related severe impairments. As detailed in the majority opinion, it is undisputed that she suffered continuing pain and received treatment for the pain, including injections, for many years as a result of these impairments. She need not be completely sedentary or often-hospitalized to find she lived with chronic pain, managing it as best she could. There is not substantial evidence in the record to support the ALJ's conclusion that Milam's impairments and pain would cause her to miss less than two days per month. See Douglas v. Bowen, 836 F.2d 392, 396 (8th Cir. 1987) ("Any conclusion that [claimant] could work at a job without having more than one or two absences due to [her] various impairments is not supported by substantial evidence."). Milam was "not required to document her absences[, s]he testified that she missed work because she was sick and there is nothing in the record to suggest that this was not the case."

-15-

Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998). Her employer not only "conceded that her absences were legitimate," id., but three separate co-workers provided personal testimony of how severe her pain was and how many days she consistently missed over the course of many years. In light of the overwhelming evidence regarding her prior absenteeism, the absence of any reason to suggest she missed work for anything other than her pain, and the undisputed medical evidence of severe impairments and pain, I believe the ALJ erred. He should have, at the very least, developed the record further, as he initially stated he would. See, e.g., Godoua v. Colvin, 564 F. App'x 876, 878 (8th Cir. 2014) ("[I]t is ALJ's duty to develop record fully and fairly during claimant's proceedings, which are non-adversarial.").

Second, as the district court acknowledged, putting the issue above aside, the ALJ concluded Milam's residual functional capacity would cause her to miss one or two days per month, which was inconsistent with the VE's testimony that missing two days per month would not be tolerated by any employer. In fact, the VE testified that only a *long-term* employer would tolerate consistent absences of one day per month. The ALJ did not explain how Milam could gain employment with a long-term employer, since her prior company no longer existed. Even if the ALJ concluded Milam would miss less than two days of work per month, it is unclear whether Milam was employable if she were to miss more than one day but less than two days per month consistently. Regardless of how we interpret the ALJ's statement, I agree with the district court that "an error was made." I disagree with the district court, however, that the error was harmless.

The district court believed that although Milam could not secure future employment as generally found in the economy based on her absenteeism, she could find work "as she actually performed it in the past" because "her former employer made accommodations that allowed her to take off *more than* two days a month." But the question of how she performed her work in the past relates to her job duties and functions—not how excessively accommodating her prior employer was. See 20

-16-

C.F.R. § 404.1560(b) ("We will first compare our assessment of your residual functional capacity with the *physical and mental demands* of your past relevant work." (emphasis added)); 20 C.F.R. § 404.1520(f) ("If you can still do this *kind* of work . . . ." (emphasis added)). The fact that her prior employer went out of its way to accommodate Milam cannot be used to contradict the VE's undisputed testimony that no other employer would tolerate more than one absence per month on a consistent basis. The ALJ's apparent finding that Milam would miss more than one day per month consistently was above the threshold the VE testified would be tolerated by any employer. In light of the undisputed testimony from the VE, I believe the ALJ erred in finding Milam could find employment if she were to consistently miss more than one day per month for a new employer.

———————————————

-17-