# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-2834

_____

Karl William Wright

*Plaintiff - Appellant*

v.

Carolyn W. Colvin, Acting Commissioner of Social Security

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: February 11, 2015
Filed: June 15, 2015

_____

Before LOKEN, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Karl William Wright appeals the district court's[1] order upholding the Social Security Commissioner's decision to deny his applications for disability insurance

---

[1]The Honorable Robert E. Larson, United States Magistrate Judge for the Western District of Missouri, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

benefits and supplemental security income benefits. Wright argues that the administrative law judge (ALJ) erred by discrediting the opinions of two examining physicians, discrediting Wright's testimony, not considering Wright's mental condition as a severe impairment, and not considering the record as a whole. We affirm.

## I. *Background*
### A. *Wright's Physical Condition*

Wright is a fifty-year-old man that suffers from back and knee pain. Wright suffered a shoulder injury and complained of low back pain after being involved in a severe car accident in 2000. The record indicates that Wright also suffered from another severe automobile accident in 1987. Wright described his pain as a "stinging" pain in his lower middle back and that this pain "goes down both" legs. Wright's obesity compounds his problems. At the time Wright applied for social security benefits, he was six-feet tall and weighed 350 lbs. As a result of his pain and obesity, Wright testified that his average day consists principally of laying on his back trying to get comfortable and spending around 30 minutes cooking basic meals for himself. Wright testified that his pain forces him to keep his movements during the day to a minimum. His limited mobility notwithstanding, Wright is able to drive and goes out "[a]bout three times a month" to the grocery store, the bank, and appointments with doctors. Wright's physical limitations, however, do not affect "his ability to remember, concentrate, understand, follow instructions, use his hands, or get along with others."

Due to his condition, Wright sought the help of several doctors over the past several years to manage his pain. After his car accident in 2000, Wright weighed 260 lbs., his C-spine series was negative, and his lumbar spine was described as "unremarkable." Nearly a decade later, Wright's weight had substantially increased. On August 14, 2009, Wright began visiting Dr. Joshua Griggs, a family physician. By this date, Wright weighed 356 lbs. Dr. Griggs noted that Wright "has a past medical

history of degenerative disc disease in the spine . . . as well as multi-level disc disease in the L4-L5 area." On top of these back issues, Dr. Griggs noted that Wright had "type 2 diabetes, vitamin D deficiency, tobacco abuse, obesity, [and] bilateral knee arthritis." Wright was able to bend his back over to 90 degrees, and "[e]xtension, lateral bending and twisting is all painful but normal." In addition to prescribing diabetes treatment and pain medication, Dr. Griggs counseled Wright on diet and exercise to lose weight. Dr. Griggs noted that Wright was "adamantly against" taking water aerobic classes because of the cost; still, Dr. Griggs advised Wright to start walking because it was free.

On September 1, 2009, Wright saw Dr. William Harris, an orthopedic surgeon, to assess Wright's knee pain. Dr. Harris found that Wright's knees were tender and showed "a little bit of loss with the weightbearing space" but otherwise exhibited a regular range of motion and "appeared to be essentially unremarkable with very minimal degenerative changes."

On December 10, 2009, Wright saw Dr. Usaikimi Igbaseimokumo, a neurological surgeon. Dr. Igbaseimokumo diagnosed Wright with "[l]umbar spondylosis with low back pain." Dr. Igbaseimokumo noted that Wright complained of "low back pain" but had "no significant leg pain" on that particular occasion. Dr. Igbaseimokumo also found that Wright's lumbar spine was tender, but found no "obvious deformity."

On February 19, 2010, Wright underwent an MRI of his lumbar spine. The MRI revealed degenerative disks at L4-L5 and L5-S1 of Wright's spine. Also, there was a moderate to severe central canal narrowing at L4-L5 with a diffuse disc bulge and a triangular appearance. There was also a mild diffuse disc bulge at L5-S1 with mild narrowing of the neural canal. Additionally, there was a possible L3-L4 left paracentral disc osteophyte.

Wright did not seek medical help again until eight months later on November 3, 2010. Wright saw Dr. Griggs on this date, who prescribed an anti-depressive for his "[c]omplete decompensation due to major depressive disorder."

On November 15, 2010, Wright visited Dr. Michael Vierra, a radiologist, who x-rayed both of Wright's knees. The results found no fracture, no joint effusion, and mild degenerative changes in the medial joint compartment. Dr. Vierra also conducted an x-ray of Wright's spine, which showed that a previous "compression deformity of T12 [was] unchanged" and revealed mild degenerative changes.

Wright continued to see Dr. Griggs in January and February 2011 and continued to complain of back pain. Dr. Griggs reported that Wright could not lift more than 15 lbs. and could not stoop, climb, bend, or twist. When asked if Wright could stand for two hours and sit for six hours during an eight hour workday, Dr. Griggs reported that Wright could only stand for less than "10–15 minutes" and could only sit for "30 min[utes] at a time" before "need[ing] to lay down."

On March 3, 2011, Wright had another MRI of his lumbar spine. The MRI showed "[b]orderline spinal stenosis at L4-L5" and "posterior sublaxation of L5 on S1 with circumferential disc bulge without spinal stenosis." Interrogatories were propounded to Dr. Griggs, who described Wright as suffering from "[b]ilateral knee arthritis [and] [d]egenerative [l]umbar [d]isc [d]isease," among other things.

On July 8, 2011, Wright saw Dr. Tomoko Tanaka, a neurosurgeon. Dr. Tanaka found that Wright exhibited 5/5 in a motor strength test of his upper extremities and 5/5 in a motor strength test in his lower extremities "with give-way to pain in the psoas [muscle] on flexion of the hip." Also, Wright exhibited 5/5 in a motor strength

-4-

test in bending his knees and ankles.[2] Dr. Tanaka concluded that Wright suffered from lumbar spondylosis but that surgery was not a viable solution. A follow up with Dr. Tanaka on July 14, 2011, showed no abnormal movement in Wright's back.

On November 28, 2011, Wright saw Dr. Garth Russell. Dr. Russell conducted a physical examination and reviewed Wright's past medical records. Dr. Russell diagnosed Wright with "[d]egenerative disc disease, chronic with spinal stenosis L4-5, moderately severe," among other things. Dr. Russell also noted that Wright's "knees have degenerated to the point where they are unable to tolerate [his] weight except for short periods of time." Dr. Russell concluded by stating that Wright would survive "only with a significant amount of medical attention and medications. He will spend most of his time in a recumbent position because of the pain. In addition, he would be unable to sit longer than 20 to 30 minutes or to stand for about that same length of time."

On several occasions, Wright admitted that he was not taking his pain medication; this was against the recommendation of his treating physician, Dr. Griggs. Wright also declined conservative treatment options, such as physical therapy, against the recommendation of several doctors.

## B. *Wright's Mental Condition*

In addition to his physical limitations, Wright has also been treated for depression. Dr. Griggs began noticing Wright's depression in November 2010 and prescribed Wright an anti-depressant. Dr. Griggs saw Wright's depression as a major obstacle in getting Wright on track to achieve overall health. On January 26, 2011, Wright saw Dr. Kim Dempsey, Psy.D, to assess his mental condition. Wright denied

---

[2]We have interpreted 5/5 strength test results to represent normal or maximum muscle strength. *See Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (associating a "5/5 strength" test result with "normal or full muscle strength" (citing *Flynn v. Astrue*, 513 F.3d 788, 793 (8th Cir. 2008)).

being depressed to Dr. Dempsey and claimed that he is motivated to do tasks; however, he stated that he cannot usually finish tasks because "the mind is willing but the body is not." (Quotation marks omitted.) Dr. Dempsey also found that Wright's mental concentration suffered deficits because he was limited by pain and not because of a mental health condition. Dr. Dempsey ultimately diagnosed Wright with "Adjustment Disorder with Depressed Mood" and measured his "Global Assessment of Functioning [GAF] = 60."

On February 7, 2011, Wright saw Dr. James W. Morgan, Ph.D, to assess his mental health in connection with his disability application. Dr. Morgan concluded that Wright's mental impairment was not severe. Dr. Morgan noted that Wright had mild daily living restrictions, mild difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence, or pace.

## C. *Wright's Work History*

Wright's work history includes construction work (1983–93), renting out equipment (1994–95), and hanging wallpaper (1996–2008). During the past thirty years, however, Wright's reported taxable income has fluctuated dramatically. Wright has not reported earning any income in the years 2006–11. Additionally, Wright did not report any income in the years 1981 and 1987. When he did earn income, it was seldom over $10,000 for the year.

## D. *Procedural History*

Wright filed for disability insurance benefits and supplemental security income benefits on December 14, 2010. In both claims, he alleged the onset of his disability as April 14, 2010. After both of Wright's applications were denied, he requested a hearing before an ALJ for reconsideration.

After reviewing the record in its entirety, the ALJ found that Wright was not disabled under the Social Security Act and thus was ineligible for benefits. The ALJ

followed the following familiar process to determine disability: "1) whether the claimant is currently employed; 2) whether the claimant is severely impaired; 3) whether the impairment is, or is comparable to, a listed impairment; 4) whether the claimant can perform past relevant work; and if not, 5) whether the claimant can perform any other kind of work." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (internal quotation omitted); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

At step two of the sequential evaluation, the ALJ found that Wright's depression did not constitute a severe impairment because the reports of Dr. Dempsey and Dr. Morgan indicated that Wright's functionality was only mildly impaired by his condition. Before reaching step four, the ALJ determined the following residual functional capacity (RFC): Wright could stand or walk for two hours and sit for six hours during an eight-hour workday, and he could occasionally climb ramps or stairs, stoop, kneel, crouch, crawl, and balance. In doing so, the ALJ found that Wright's testimony of back and knee pain was not corroborated by the objective medical evidence. Wright's ability to go several months without seeking medical help for the pain, his refusal to take pain medications, and his failure to seek conservative treatment options also cut against Wright's credibility. Further, the ALJ found Wright's testimony to be incredible because his work history, which indicates he worked until 2008, did not match up with his income statements, which indicate he stopped reporting income in 2006. Next, the ALJ afforded "little weight" to the opinions of Dr. Russell and Dr. Griggs because their opinions of Wright's physical functionality were not consistent with the objective medical evidence. The ALJ also justified assigning little weight to Dr. Russell's testimony because he was a "nonexamining physician."

At step four of the sequential analysis, the ALJ found that Wright's RFC would not allow him to perform the past relevant work of hanging wall paper. Notwithstanding, the ALJ adopted the vocational expert's testimony that a person with Wright's RFC could obtain gainful employment in available positions in the

-7-

national economy, such as an assembler, a weight tester, or an order clerk. Thus, the ALJ found that Wright was not eligible for benefits. The district court affirmed the ALJ's decision, and Wright now appeals.

## II. *Discussion*

On appeal, Wright alleges that the ALJ made four reversible errors. First, Wright argues that the ALJ improperly discredited the medical opinions of Dr. Russell and Dr. Griggs by erroneously stating that they were inconsistent with the medical evidence. Second, Wright alleges that the ALJ erred by discrediting Wright's testimony about his pain because of inconsistencies. Third, Wright argues that the ALJ erred by failing to find that Wright's mental condition was a severe impairment and failing to include it in Wright's RFC. Finally, Wright employs a general argument that the ALJ failed to make his denial decision based on the record as a whole.

We apply the same review standard as the district court "and uphold the . . . denial of benefits . . . if the ALJ's decision is supported by substantial evidence in the record as a whole. Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008) (alterations in original) (quotations and citation omitted). "We defer heavily to the findings and conclusions of the Social Security Administration." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010) (citing *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001)). "We must consider evidence that both supports and detracts from the ALJ's decision . . . . If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quotation and citation omitted).

### A. *Dr. Russell's and Griggs's Medical Opinions*

Wright first argues that the ALJ erred by assigning little weight to Dr. Russell's and Dr. Griggs's medical opinions. Regarding Dr. Russell, Wright argues that the ALJ erred by mischaracterizing him as a nonexamining physician. This error is relevant because the opinions of examining medical professionals are given more weight than nonexamining medical professionals. *See Shontos v. Barnhart*, 328 F.3d 418, 425 (8th Cir. 2003) ("[An examining doctor] had what the regulations describe as an examining relationship, and accordingly, his opinion would be given more weight than a source who had not examined [the claimant]." (citing 20 C.F.R. § 404.1527(d)(1) [now subsection (c)(1)])). The record indicates that Dr. Russell *did* base his opinion on a physical examination of Wright. Even though there was only one such examination, this should qualify Dr. Russell as an examining medical professional. The Commissioner on appeal agrees that the ALJ mistakenly classified Dr. Russell as a "nonexamining physician."

When examining the ALJ's decision, however, this was the lesser of two reasons that Dr. Russell's opinion was given little weight. As the ALJ stated, "*[f]ar more significant* is the fact that his conclusions are not supported by the record." (Emphasis added.) There is substantial evidence in the record to support the ALJ's finding that both Dr. Russell's and Dr. Griggs's opinions were not consistent with the objective medical evidence that relates to determining disabling pain levels. *See Perkins*, 648 F.3d at 897 ("An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." (quotation and citation omitted)). In regard to Wright's back pain, his C-spine series x-ray was negative and his lumbar spine was described as unremarkable in 2000 after his severe car accident, which is supposedly the root cause of his current physical limitations. In 2009, Dr. Igbaseimokumo found no obvious deformity in Wright's lumbar spine. In 2010, an x-ray of Wright's back revealed that a compression deformity had gone unchanged

and otherwise only showed mild degenerative changes. In 2011, Dr. Tanaka found that Wright exhibited a 5/5 motor strength test in his lower extremities. In regard to Wright's knee pain, x-rays performed in 2009 did not show any fractures and Wright's knees were described as being unremarkable with minimal degenerative changes. These results were echoed in 2010 when x-rays of Wright's knees returned similar results. Thus, we find that there is substantial evidence to support the ALJ's decision to assign the opinions of Dr. Russell and Dr. Griggs little weight.[3]

B. *Wright's Testimony*

Wright next argues that the ALJ erred by finding his testimony of subjective pain and functionality incredible due to the inconsistencies in his work history, daily activities, and failure to adhere to treatments. "[C]redibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)). "An ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances." *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted). In addition to the "objective medical basis" that should support the subjective testimony of disabling pain, this court takes into account "all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Polaski* outlined a list of five factors which this court and ALJs must take into account when judging the credibility of testimony on subjective pain: "1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; 5. functional restrictions." *Id.*

---

[3]Wright also asserts that the ALJ "ignore[d]" Dr. Russell's testimony and "found that [his testimony] did not exist." This argument has little merit because the ALJ acknowledged that he did take Dr. Russell's testimony into account, but only assigned it "little weight."

The ALJ found Wright's work history troubling for two reasons: First, Wright claimed he had not worked since 2008, but the onset of his disability was in 2010; and second, Wright did not report any earnings for the tax years of 2006, 2007, and 2008, which is inconsistent with his reported work history that did not end until 2008. Wright only briefly addresses the ALJ's first finding by arguing that the reason he was not working from 2008–10 was because this was a period in which he previously applied for social security benefits but was similarly denied. Wright seemingly ignores the ALJ's second point, however, and offers no explanation why he did not report any income for 2006–08 if he was supposedly working full time as a wallpaper hanger during that period. Even more troubling is Wright's work history going back over thirty years. Since 1978, Wright has reported not having any earnings a total of eight times. Out of the 26 years he has reported earnings, half of those years he reported earning less than $5,000 and never reported earning more than $20,000. While Wright suffered severe automobile accidents in 1987 and 2000, it appears his inability or unwillingness to find gainful employment preceded these events. *See Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001) (discussing an ALJ decision where the claimant's "work history suggested poor motivation and called his disability claim into question"). It appears that Wright is either untruthful in reporting his income or he is untruthful in portraying his work history. Either way, this evidence supports the ALJ's discounting of Wright's credibility.

Review of the record also reveals the ALJ properly considered other *Polaski* factors in discrediting Wright's testimony of disabling pain and forming the RFC. Wright himself admits to engaging in daily activities that this court has previously found inconsistent with disabling pain, such as driving, shopping, bathing, and cooking. *See, e.g.*, *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) (finding that the claimant's shopping, driving short distances, attending church, and visiting relatives were inconsistent with suffering disabling pain); *Lawrence v. Chater*, 107 F.3d 674, 676 (8th Cir. 1997) (finding that the claimant's dressing herself, bathing herself, cooking, and shopping was inconsistent with disabling pain). Additionally,

the ALJ noted that Wright's credibility suffered from his refusal to take pain medication and his refusal to seek out even conservative treatments such as physical therapy. *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2009) (finding a claimant's noncompliance with a diet regimen prescribed by their doctor contributed to a negative credibility determination). Further, Wright's complaints of disabling pain are also undercut by the eight-month period during which he sought no medical care. Given the ALJ's findings of inconsistencies in Wright's work history and consideration of the *Polaski* factors, we conclude that substantial evidence supports its credibility finding.

## C. *Wright's Mental Condition*

Wright next argues that the ALJ erred by not taking his depression or his GAF score of 60[4] into account when forming the RFC. Specifically, Wright argues that his depression and GAF score should have been classified as a severe impairment under step two and thus appropriately grafted into his RFC. First, the ALJ properly considered the opinions of Dr. Dempsey and Dr. Morgan, the two mental health specialists that examined Wright. Dr. Dempsey found that Wright's mental condition did not affect his functionality, but rather that his pain limited his ability to complete mental tasks. This was corroborated by Dr. Morgan's findings that Wright's mental condition only mildly affected his overall functionality. While "[s]everity is not an onerous requirement for the claimant to meet . . . it is also not a toothless standard." *Kirby v. Astrue*, 500 F.3d 705, 708 (8th Cir. 2007) (citation omitted). Based on the findings of the two mental health professionals in the record, substantial evidence supports the ALJ's disposition.

---

[4]The GAF scale measures "psychological, social, and occupational functioning" on a 1 to 100 scale. *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994). A GAF score of 60 means that the patient has "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning." *Id.* at 32.

Additionally, substantial evidence supports the ALJ's decision not to give weight to Wright's GAF score because GAF scores have no direct correlation to the severity standard used by the Commissioner. *See* 65 Fed. Reg. 50746, 50764–65 ("[GAF scores] do[] not have a direct correlation to the severity requirements in our mental disorders listings."); *see also Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010) (finding that the claimant's GAF score ranges from 52–60 "indicate [the claimant] has moderate symptoms or moderate difficulty in social or occupational functioning" (citation omitted)). Thus, even assuming the validity of the GAF score of 60, such a score supports the ALJ's decision that Wright's depression was not severe.

Wright also cites to several places in the record where Dr. Griggs and a handful of other medical professionals made statements regarding Wright's depression and anxiety. The ALJ was within his purview not to give these observations much weight because they were not from specialists in the mental health field. *See* 20 C.F.R. § 404.1527(c)(5). Therefore, substantial evidence supports the ALJ's consideration of Wright's mental condition.

## D. *Consideration of the Record as a Whole*

Finally, Wright argues that the ALJ failed to consider the record as a whole when determining Wright's RFC. The only argument not already addressed above is Wright's contention that the ALJ failed to take Wright's obesity into account. The record indicates this argument is without merit. "'We have held that when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal.'" *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009) (quoting *Brown ex rel. Williams v. Barnhart*, 388 F.3d 1150, 1153 (8th Cir. 2004)). The ALJ explicitly stated that he "considered the combined effects of the claimant's obesity with the claimant's other impairments when determining that he retains the ability to perform a range of sedentary work within the limitations identified." As we have discussed above, the ALJ properly considered the record as

a whole. Wright's disagreements with the ALJ's conclusions made from its review of the entire record do not mean the ALJ did not consider the whole record.

### III. *Conclusion*

For the reasons stated herein, we affirm.

_____