# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3460

_____

Paula Sue Michel

*Plaintiff - Appellant*

v.

Carolyn W. Colvin, Acting Commissioner of Social Security

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Northern District of Iowa - Dubuque

_____

Submitted: September 21, 2015
Filed: March 23, 2016
[Unpublished]

_____

Before MURPHY, MELLOY, and SMITH, Circuit Judges.

_____

PER CURIAM.

Paula Michel appeals from the district court's[1] order affirming the Commissioner of Social Security Administration's ("Commissioner") denial of Michel's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq*. We affirm.

## I. *Background*

Michel was born on September 7, 1966, and is a college graduate. Prior to October 2009, she was employed for 20 years as a speech pathologist at the Mississippi Bend Area Education Agency. She alleges that she became disabled beginning October 22, 2009, due to chronic fatigue syndrome, fibromyalgia, and depression.

### A. *Medical Evidence*

The medical evidence shows that Michel sought treatment for achiness in January 2009. Dr. John Viner, M.D., diagnosed Michel with malaise, stomatitis, and an exacerbation of chronic fatigue. In July 2009, Michel reported achiness in her hands to Dr. Viner, but she also stated that her "[e]nergy has been pretty good." Dr. Viner assessed hand arthritis and noted Michel's improved fatigue. But on November 2, 2009, Michel returned to Dr. Viner due to "chronic fatigue problems," asthenia, and depression. Dr. Viner diagnosed Michel with "[i]nfluenza-like illness." On November 23, 2009, Michel reported "ongoing fever." Then, on December 8, 2009, after Michel presented to Dr. Viner with "generalized aching" and a "low grade fever," Dr. Viner diagnosed Michel with "[r]ecurrent chronic fatigue syndrome" and also identified an autoimmune disease as a "consideration" due to Michel's "[d]iffuse pains." Dr. Viner again assessed Michel with chronic fatigue syndrome when she presented to him with a "low energy level" and muscle weakness on January 5, 2010; he did, however, note that "Michel has had some improvement." He also reported on February 16, 2010, that

---

[1]The Honorable Jon S. Scoles, United States Magistrate Judge for the Northern District of Iowa, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

while Michel had chronic fatigue syndrome and "remain[ed] tired," she had also "shown favorable response over the last 5 or 6 weeks to the addition of methylphenidate" and was now "able to walk 10 minutes up to three times a day" and was sleeping well. Michel continued to see Dr. Viner every three months for medication adjustment.

Michel also underwent mental health medication management and therapy with Susan Amundsen, a physician assistant, and Gerald Odefey, a psychologist, for anxiety and depression, with predominately "unchanged" findings from January 2009 through June 2011. Michel reported increased depression to Amundsen on January 6, 2010, one day after Dr. Viner had again assessed Michel with chronic fatigue syndrome. In April 2010, Michel reported to Amundsen that she had "decided not to go back to her job [and] need[ed] to look for something else that will have insurance." In November 2010, Michel reported increased irritability with a change in her medication.

On April 30, 2010, Michel saw Dr. George Isaac, M.D., a rhematologist. She complained of muscle and joint aches in her hands, neck, upper and lower back, hips, knees, and ankles. Dr. Isaac found "no significant limited range of motion in [Michel's] cervical, thoracic, or lumbar spine on passive range of motion," but he noted that "the patient is not moving very well." Although Michel "complain[ed] of some pain with passive range of motion of her cervical spine," Dr. Isaac found "no evidence of any radiculopathy."[2] And, while Dr. Isaac noted "some tenderness involving [Michel's] trapezius muscle and anterior upper chest," he found that Michel had a "good range of motion in the shoulders, elbows, wrists, and hand joints without any swelling, redness, or increased warmth" and "reasonable grip strength bilaterally" despite some tenderness. As to Michel's lower extremities, Dr. Isaac noted "mild

_____

[2]"Radiculopathy is defined as a disease of the nerve roots." *Broadbent v. Harris*, 698 F.2d 407, 410 n.1 (10th Cir. 1983) (citing *Dorland's Illustrated Medical Dictionary* (25th ed.)).

tenderness involving both hips"; a normal range of motion "when passively forced, but actively . . . some limited range of motion on external rotation"; "no problems on flexion and abduction"; "no swelling, redness, or increased warmth in her knees"; and "no evidence of any rashes." Dr. Isaac diagnosed fibromyalgia and chronic fatigue syndrome. In assessing Michel's condition, Dr. Isaac noted that Michel "has a mind set that she has chronic fatigue and she seems to have lost hope in getting better which is the biggest problem that we usually face in these conditions." He informed Michel "that it would be up to her whether she wants to get better or not because [he] could start her on all of the medications in the world and that is not going to help." At Michel's May 28, 2010 visit, Dr. Isaac noted that while Michel still had "generalized tenderness," her "pain has gotten significant[ly] better with [medication]"; he also observed that "her coping with pain will also get better." On June 28, 2010, Dr. Isaac again acknowledged that Michel had "generalized tenderness" but stated that he was "very pleased with her progress with the [medication]." Michel returned to Dr. Isaac monthly from October through December 2010, with reports of generalized tenderness; pain in her shoulders, elbows, fingers, and right thumb; and difficulty sleeping.

On November 17, 2010, Dr. Laura Griffith, D.O., a state-agency medical consultant, reviewed Michel's medical records and completed a physical residual functional capacity assessment (RFC). Dr. Griffith opined that Michel could (1) occasionally lift or carry ten pounds, (2) frequently lift or carry less than ten pounds, (3) stand or walk with normal breaks for at least two hours in an eight-hour workday, (4) sit with normal breaks for about six hours in an eight-hour workday, and (5) push or pull without limitations. Further, Dr. Griffith opined that Michel could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Dr. Griffith found that Michel should avoid concentrated exposure to extreme cold and extreme heat. Dr. Griffith found no manipulative, visual, or communicative limitations for Michel. Dr. Dennis Weis, M.D., reviewed Michel's medical records and affirmed Dr. Griffith's opinion in April 2011.

On November 24, 2010, Dr. Keith F. Gibson, Ph.D., performed a consultative psychological evaluation of Michel. Dr. Gibson observed that Michel walked with a "slow, cautious gait" and that her "[g]eneral body movements were quiet and subdued." He opined that Michel's "[a]ffect was appropriate to thought content" and observed "[n]o lability[3] of affect." He described her "[p]redominant mood [as] depressed with persistent feelings of sadness and discouragement about the future." He found her to be "anhedonic[4] with increased irritability" and "preoccupied with physical aches and pains." Dr. Gibson noted that Michel's "performance on the Mini Mental Status Exam suggests that overall cognitive capacity is grossly intact with some difficulties in the areas of attention, concentration, and delayed recall." He diagnosed Michel with pain disorder and mood disorder due to chronic fatigue syndrome with depressive features. He concluded that Michel could still remember and understand instructions but that "[c]hronic fatigue and pain with concomitant worry and depressive symptoms significantly impair [Michel's] capacity to maintain attention, concentration, and pace sufficient for full-time gainful employment." He found that she retained the "capacity to interact appropriately with others in a work environment," "[h]er judgment remained intact," and she was capable of "mak[ing] reasonable decisions for herself on a day-to-day basis." Nevertheless, he concluded that Michel's "[c]hronic fatigue and chronic pain impair her capacity to respond adaptively and flexibly to changes in the work place."

---

[3]"According to Social Security regulations, 'emotional lability' is an 'organic mental disorder' whose symptoms include 'explosive temper outbursts or sudden crying, and impairment in impulse control.'" *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 144 n.3 (3d Cir. 2010) (quoting 20 C.F.R. Part 404 Subpart P App'x 1 (Listings) § 12.02(A)).

[4]"Anhedonic is defined as 'a psychological condition characterized by inability to experience pleasure in normally pleasurable acts.'" *Petri v. United States*, 104 Fed. Cl. 537, 544 n.14 (2012) (quoting Merriam-Webster's Collegiate Dictionary 48 (11th ed. 2003)).

On January 13, 2011, Dr. David Christiansen, Ph.D., a state-agency psychological consultant, reviewed Michel's medical records and completed a mental RFC assessment for Michel. He determined that Michel was moderately limited in her ability to (1) carry out detailed instructions, (2) maintain attention and concentration for extended periods, and (3) complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Christiansen found Dr. Gibbons's opinion "consistent with the rest of the record." He concluded that while "[c]hronic fatigue and pain, along with worry and depressive feelings significantly impair [Michel's] capacity to maintain attention, concentration, and pace," she retained the "capacity to maintain appropriate relationships in the work setting," had intact judgment, and was "able to manage day-to-day activities." In April 2011, Dr. John Tedesco, Ph.D., reviewed Michel's medical records and affirmed Dr. Christiansen's opinion.

In March 2011, Dr. Mark Niemer, M.D., evaluated Michel's fibromyalgia on referral from Dr. Viner. A physical examination of Michel showed mild tenderness in her neck, back, and shoulders; she had a full range of motion in all joints, full strength, and no atrophy. Dr. Niemer assessed Michel with depressive disorder, stating that "she is depressed and she has a lot of somatic symptoms. Where depression ends and chronic fatigue or fibromyalgia begin is almost impossible to say." Dr. Niemer recommended that Michel "work with Sue Amundsen about keeping her meds under control for her depression" and "continue to exercise on a regular basis, about 20–30 minutes daily."

On March 28, 2011, Michel returned to Dr. Isaac, who noted that Michel's recognition that she "fe[lt] better" and that her pain was "a little less," although she still experienced achiness "in her ankles, heels, and knees." But he reiterated that Michel did not feel as bad as she previously did. He opined that Michel was "better" and observed that she was "at least smiling and she seems to be somewhat more

rested." Dr. Isaac "suggested that she start[] gradual escalation of her exercise" and "made some recommendations in regards to her medications and daily activities."

In May and June 2011, Michel went to the University of Iowa Hospitals and Clinics and saw a medical student and Dr. Jacob Ijdo, M.D., Ph.D. Michel complained of persistent "fatigue, myalgias, and arthralgias" since October 2009 and reported "walking 15 minutes per day, 3 times per day, most days out of the week." A physical examination of Michel revealed "normal strength and tone though exam limited by pain," "[n]ormal symmetric reflexes," and a "[n]ormal gait." The medical student diagnosed fibromyalgia, chronic fatigue syndrome, and depression. He recommended that Michel reduce the number of medications that she is taking, which were "not helping [Michel's] symptoms and may be causing some symptoms such as mental fogging and flat affect." He also advised Michel "to push herself with exercise within reasonable limits" and to avoid "daytime naps as they disturb nighttime rest." Dr. Ijdo similarly believed plaintiff was over-medicated, resulting in sleepiness, and he recommended no daytime naps and an increase in exercise. He too recommended that she "simplify" her medications.

On July 25, 2011, Michel presented to Dr. Viner with stiffness and pain in her back and hips. A physical examination of Michel revealed that Michel was "weak and tired-appearing." He observed that she is unable "to do much activity at home." Dr. Viner assessed Michel with "[d]isabling fibromyalgia," as well as "chronic fatigue, autonomic dysfunction[,] and palmar hyperhidrosis." In accordance with Dr. Ijdo's recommendation, Dr. Viner reduced one of Michel's medications. He concluded that Michel's "functional capacity remains low" and opined that "she is disabled from employment."

On September 17, 2012, Michel's attorney referred her to Work Systems Rehab & Fitness for a functional capacity evaluation. Mark Blankespoor, P.T., D.P.T., performed the evaluation. He noted that Michel's primary diagnoses were chronic

fatigue syndrome and fibromyalgia. Upon examination, he found "[s]ignificant [d]eficits" in the following areas: (1) lifting/carrying; (2) pushing/pulling; (3) positional tasks, such as elevated work, squatting, crouching, forward bending, trunk rotation, crawling, and kneeling; (4) sitting/standing tolerance; (5) walking tolerance; (6) stair/step ladder climbing; (7) bilateral upper extremity grip and pinch strength; and (8) bilateral upper extremity coordination. Blankespoor determined that Michel was capable of sedentary work but noted that "she would have significant difficulty with performing work tasks on a full-time basis. She would not be able to safely perform lifting, carrying, pushing, pulling, gripping, pinching, sitting, standing, walking, dexterity or positional tasks on a continuous, day after day basis."

In October 2012, Dr. Viner completed a RFC questionnaire for Michel. He indicated that he had routinely seen Michel every four to six weeks for the past ten years. He opined that Michel met the American College of Rheumatology criteria for fibromyalgia and chronic fatigue syndrome. Dr. Viner identified the following symptoms for Michel: multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, frequent severe headaches, numbness and tingling, depression, and chronic fatigue syndrome. He indicated that Michel had "daily and disabling" pain in her neck, upper back, shoulder, arms, hands/fingers, hips, legs, and knees/ankles/feet. He also identified fatigue, movement, overuse, cold, and stress as factors that precipitated the pain. According to Dr. Viner, Michel would frequently experience pain or other symptoms severe enough to interfere with her attention and concentration during a typical eight-hour workday. He concluded that Michel would be "[i]ncapable of even 'low stress' jobs." He opined that Michel's prognosis was "prolonged disability." Dr. Viner offered no opinions of Michel's functional abilities; instead, he simply concluded that she was "unable to work."

B. *Testimony at Administrative Hearing*

Michel filed an application for disability insurance benefits on October 5, 2010, alleging an onset date of October 22, 2009. After an initial denial of benefits, Michel requested a hearing before an administrative law judge (ALJ).

At the hearing, Michel testified that she last worked as a speech pathologist at the Mississippi Bend Area Education Agency in October 2009. According to Michel, she stopped working due to flu-like symptoms and fibromyalgia pain; she stated that she could no longer write or type for more than five minutes at a time. She testified to having pain from "the top of [her] neck all the way down through [her] ankles, not every single spot, but probably 80 percent of that area." She also reported having fatigue that made it difficult for her to concentrate and focus. She explained that she tries to walk for approximately ten minutes in the morning for exercise but becomes short of breath and achy. She estimated that she could lift 15 to 20 pounds very briefly.

The ALJ provided vocational expert (VE) Julie Svec with a hypothetical for an individual with Michel's age, education, and past relevant work and who "has some functional limits, mainly that the worker is limited to performing sedentary work as that term is defined in the *Dictionary of Occupational Titles* [(DOT)], and in addition, this worker can only occasionally stoop, crouch, kneel and crawl, and the worker is unable to climb ladders, ropes or scaffolds at all." The ALJ also asked the VE to assume that the individual could not "be exposed to any extraordinary hazards on the job, . . . mean[ing] work near dangerous moving machinery or work at unprotected heights where someone sort of lost control of her body or lost strength or for whatever reason they would be in serious danger." The ALJ asked the VE " to assume that this worker needs work indoors in a climate-controlled environment much like would be found in a typical office setting or retail store, something like that, air-conditioned, heated with no real dust, gases." Finally, the ALJ asked the VE "to assume that this worker can do only the most simple and repetitive and routine types of work, work

that doesn't require any close attention to detail at all and doesn't require the use of any independent judgment on the job."

The VE replied that "[t]here is an occupational base that would include sedentary and unskilled jobs such as work as a document preparer," pursuant to DOT 249.587-018. The VE identified 500 document-preparer positions in "this area" and 50,000 positions nationwide. The VE also identified a ticket checker as another sedentary, unskilled position, pursuant to DOT 219.587-010. She testified that 400 ticket-checker positions existed in "this area" and that 13,000 positions existed nationwide. Finally, she gave an order clerk as a third example of a sedentary, unskilled position, pursuant to DOT 209.567-014. She identified 400 order-clerk positions in "this area" and 23,000 positions nationwide.

The ALJ then provided the VE with a second hypothetical, which was identical to the first hypothetical, except that "due to fatigue, the worker would be unable to use their [sic] hands to perform any job task whatsoever, in other words[,] cannot grasp, finger, handle anything at all more than a total of two hours a workday." The VE testified that under such limitations, no occupational base would exist for that individual.

C. *ALJ's Disability Determination*

The ALJ determined that Michel is not disabled. The ALJ undertook the familiar five-step sequential process for determining disability. *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." (quotation and citation omitted)).

-10-

The ALJ applied the first step of the analysis and determined that Michel had not engaged in substantial gainful activity since October 22, 2009. *See Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010) ("The ALJ first determines if the claimant is engaged in substantial gainful activity. If so, the claimant is not disabled."). At the second step, the ALJ concluded from the medical evidence that Michel "has the following severe impairments: fibromyalgia; mood disorder; pain disorder; chronic fatigue syndrome." *See id.* ("Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months."). At the third step, the ALJ determined that Michel did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the regulations. *See id.* ("Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled.").

At the fourth step, the ALJ determined Michel's RFC consistent with the first hypothetical posed to the VE; that is, that Michel could perform sedentary work. *See id.* ("However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled."). In determining Michel's RFC, the ALJ discussed in great detail the opinions of Michel's treating sources, examining sources, and non-examining sources and the weight that the ALJ afforded to these sources.

At step five, the ALJ determined that based on her age, education, prior work experience, and RFC, Michel could work at jobs that existed in significant numbers in the national economy; therefore, she was not disabled. *See id.* ("Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.").

Michel requested review of the ALJ's decision to the Appeals Council of the Social Security Administration ("Appeals Council"). The Appeals Council denied Michel's request for review. Michel then sought review in the federal district court, which affirmed the ALJ's decision.

## II. *Discussion*

On appeal, Michel argues that (1) the RFC was not based on substantial evidence because the ALJ gave insufficient weight to the opinions of Dr. Viner, Blankespoor, Dr. Isaac, and Dr. Gibson; (2) the ALJ erred in evaluating her impairments of chronic fatigue and fibromyalgia; and (3) the VE's testimony was based on an incomplete hypothetical that did not take into account all of her impairments and limitations.

In reviewing the ALJ's decision, "[w]e apply the same review standard as the district court 'and uphold the . . . denial of benefits . . . if the ALJ's decision is supported by substantial evidence in the record as a whole.'" *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (alterations in original) (quoting *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008)). We have defined "'[s]ubstantial evidence'" as "'less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.'" *Id.* (quoting *Juszczyk*, 542 F.3d at 631). "'We defer heavily to the findings and conclusions of the Social Security Administration.'" *Id.* (quoting *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010)). "We must consider evidence that both supports and detracts from the ALJ's decision, but we will not reverse an administrative decision simply because some evidence may support the opposite conclusion." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quotations and citations omitted). After reviewing the record, if we "find[] it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings," then we "must affirm the ALJ's decision." *Id.* (quotations and citations omitted).

-12-

A. *RFC Assessment*

As explained *supra*, the fourth step of the sequential process "requires the ALJ to consider whether the claimant retains the RFC to perform her past relevant work." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (quotation and citation omitted). The ALJ is required to "determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [her] limitations." *Id.* (alteration in original) (quotation and citation omitted). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Id.* (quotation and citation omitted). The claimant "bears the burden of proving her RFC." *Id.*

We have previously described "how the ALJ weighs medical opinions" under the Social Security Administration regulations. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). Relevant to the present case, the ALJ affords a treating source's opinion "controlling weight" if that opinion "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence in [the applicant's] record*.'" *Id.* at 848–49 (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)). "[W]hile a treating physician's opinion is generally entitled to 'substantial weight,' such an opinion does not 'automatically control' because the hearing examiner must evaluate the record as a whole." *Id.* at 849 (quoting *Wilson v. Apfel*, 172 F.3d 539, 542 (8th Cir. 1999)). When a treating physician's opinion is in conflict with other substantial medical evidence, then the ALJ may afford less weight to that physician's opinion. *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013–14 (8th Cir. 2000)). An ALJ is also entitled to credit "'other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence.'" *Id.* (quoting *Prosch*, 201 F.3d at 1014). The ALJ must resolve any conflicts that arise between a one-time consultant's opinion and a treating physician's opinion. *Id.* (citing *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000)). Generally, "'the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence'

upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician.'" *Id*. (quoting *Cantrell*, 231 F.3d at 1107). But two exceptions exist to this general rule. *Id*. We will uphold an ALJ's discounting or disregarding of a treating physician's opinion "'(1) where other medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Id*. (quoting *Cantrell*, 231 F.3d at 1107).

### 1. *Dr. Viner*

We begin with the opinion of Dr. Viner, Michel's treating physician. In weighing Dr. Viner's opinions, the ALJ afforded "little weight" to Dr. Viner's "opinion" that he expressed on "several occasions" that Michel "was disabled." The ALJ's conclusion with respect to Dr. Viner's opinions that Michel is "disabled" and "unable to work" is correct. "[A] treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets *no deference* because it invades the province of the Commissioner to make the ultimate disability determination." *Perkins*, 648 F.3d at 898 (emphasis added) (quotation and citation omitted).

In addition, the ALJ pointed out that "while Dr. Viner reported that the claimant was 'unable to work'" on the RFC questionnaire, he "failed to fill out any functional limitations resulting from her diagnosed impairments." "The process by which the ALJ approached Dr. [Viner's] evaluation is consistent with our precedent. Indeed, we have recognized that a conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration.'" *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)). "We have stated that '[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements.'" *Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir. 2014) (alterations in original) (quoting *Wildman*, 596 F.3d at 964).

-14-

The ALJ also afforded "little weight" to Dr. Viner's opinions, finding that such opinions "are both internally inconsistent within the report and externally inconsistent with the doctor's prior treatment records." The most glaring inconsistency that the ALJ identified was Dr. Viner's statement "that [Michel's] 'symptoms and limitations on this questionnaire' applied to dates for the last '10 years[.']" As the ALJ noted, this statement contradicts Michel's own work history, which shows that she "continued working successfully until October 2009." This inconsistency with Michel's work history "alone is sufficient to discount the opinion." *See Goff*, 421 F.3d at 790–91 ("While the ALJ also found Dr. Prihoda's opinion to be internally inconsistent, we need not comment on that, as an appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion.").[5]

Accordingly, we find that the ALJ considered Dr. Viner's opinions at great length and provided sufficient bases for the "little weight" afforded to those opinions.[6]

---

[5]The ALJ also identified three other inconsistencies in Dr. Viner's opinions. First, the ALJ cited Dr. Viner's indication that Michel experienced pain in her feet; the ALJ found that "medical records failed to indicate that [Dr. Viner] ever observed any pain symptoms in her feet." Second, the ALJ found Dr. Viner's conclusion that "'changing weather' did *not* cause [Michel] pain" inconsistent with Michel's testimony "that 'rainy days' are particularly hard on her." Third, the ALJ noted the inconsistency between Dr. Viner's report of Michel's "'frequent' problems with attention and concentration" and Dr. Viner's treatment notes, which "failed to indicate that the doctor objectively found any problems outside of [Michel's] subjective complaints." The ALJ also noted that the Dr. Viner's report of Michel's problems with attention and concentration was inconsistent with Michel's "mental health providers [who] indicated that her concentration was good."

[6]Michel also argues that if the ALJ found something "unclear or missing" from Dr. Viner's opinion, then the ALJ should have sought clarification from Dr. Viner about his opinion. But "[a]n ALJ is not required to seek 'clarifying statements from a treating physician unless a crucial issue is undeveloped.'" *Grable v. Colvin*, 770 F.3d 1196, 1201 (8th Cir. 2014) (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). "That is not the case here. The ALJ considered numerous medical assessments

-15-

## 2. *Physical Therapist Blankespoor*

Michel also claims that the ALJ did not properly consider the opinion of Blankespoor, the physical therapist who performed the functional capacity evaluation. The ALJ afforded "little weight" to Blankespoor's opinion that Michel "would not be able to perform anything 'on a full-time basis'" because the ALJ found that "this opinion appeared to be based solely on [Michel's] subjective complaints and not from any objective medical testing." The ALJ noted that Michel had "reported difficulties with 'performing significant lifting, carrying, gripping, pinching, pushing and pulling as well as prolonged sitting, standing, walking, reaching, bending, squatting and climbing.'" According to the ALJ, such "difficulties" "were essentially the same limitations Mr. Blankespoor noted when indicating that [Michel] would be unable to perform work on a full-time basis." The ALJ also explained that "while testing may have indicated [Michel's] ability to lift, there was no evidence with which the therapist could form an opinion on her ability to perform this activity full-time, outside of her subjective allegations." Finally, the ALJ found that "other medical evidence of record from [Michel's] treating and consult[ing] rheumatologists indicated normal range of motion and good strength throughout the upper and lower extremities," in contrast to Blankespoor's findings. "Based on these inconsistencies, the [ALJ] afford[ed] the opinions little weight."

---

and records in weighing Dr. [Viner's] opinion. No further clarification was required." *Id*. at 1201–02 (citing *Stormo*, 377 F.3d at 806).

"A physical therapist[7] is not an 'acceptable medical source' whose opinion is entitled to substantial weight." *Castro v. Barnhart*, 119 F. App'x 840, 842 (8th Cir. 2005) (per curiam) (quoting 20 C.F.R. §§ 404.1513, 416.913). Instead, "[a] therapist's assessment is 'other medical evidence.'" *Id.* (quoting 20 C.F.R. § 404.1513(d)(1)). "Statements from a physical therapist are entitled to consideration as additional evidence, but are not entitled to controlling weight." *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 878 (3d Cir. 2005) (citing 20 C.F.R. § 404.1513(d)). "[A] physical therapist's opinion can be considered, but the opinion is entitled to less weight than that accorded to the opinions of acceptable medical sources." *Komar v. Apfel*, 134 F.3d 382, 1998 WL 30267, at *2 (10th Cir. Jan. 9, 1998) (Table) (citing *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996)). "When assigning weight to 'other medical evidence,' the ALJ may consider any inconsistencies with the record." *Castro*, 119 F. App'x at 842 (citing 20 C.F.R. § 416.927(d)(4)).

Here, the ALJ explained how Blankespoor's finding that Michel was unable to perform work on a full-time basis "contradicted the findings of other acceptable medical sources in the record, and the ALJ properly relied on the acceptable medical sources." *See Huff v. Astrue*, 275 F. App'x 713, 716 (9th Cir. 2008) (memorandum) (citing *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001)). Furthermore, "[t]he ALJ was *entitled to give less weight* to [Blankespoor's] opinion [as to Michel's capability to perform work tasks on a full-time basis], because it was based largely on [Michel's]

---

[7]While Blankespoor's credentials indicate that he holds a doctor of physical therapy degree, they do not reflect that he is a medical doctor or other acceptable medical source. *See, e.g.*, *Sommers v. Colvin*, No. 5:14CV163/EMT, 2015 WL 4633516, at *7 n.10 (N.D. Fla. Aug. 3, 2015) ("Plaintiff refers to this physical therapist as 'Dr. Hussein.' While his credentials indicate he holds a doctor of physical therapy degree . . . , they do not reflect that this therapist is a medical doctor or other acceptable medical source."); *Adesina v. Astrue*, No. 12-CV-3184 WFK, 2014 WL 5380938, at *5 (E.D.N.Y. Oct. 22, 2014) ("Plaintiff's treating source for her musculoskeletal impairments was not a medical doctor, but a Doctor of Physical Therapy . . . .").

subjective complaints rather than on objective medical evidence." *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (emphasis added) (citation omitted).

### 3. *Dr. Isaac*

Additionally, Michel contends that the ALJ should have included in the RFC the "limitations indicated by Dr. Isaac." Michel identifies these "limitations" as (1) "[l]ingering and spreading pain through out body joints, increasing with activity"; (2) "[f]atigue which might be related to medication"; (3) "[n]ot sleeping well after removal of Trazadone"; (4) "[t]rembling in hands"; (5) "[k]nees aching, not sleeping well at night, tired all over[,] generalized tenderness involving proximal and distal musculature"; and (6) Dr. Isaac's observation that "[t]oday is not a good day for patient." As the Commissioner points out, Dr. Isaac never provided an opinion as to Michel's functional *limitations*; instead, he noted that it was "up to [Michel] whether she wants to get better or not." Michel's listing of the purported "limitations" that Dr. Isaac identified is actually a summary of the *symptoms* that Dr. Isaac identified.

### 4. *Dr. Gibson*

Michel alleges that the ALJ erroneously rejected the opinion of Dr. Gibson, who performed a consultative psychological evaluation of Michel. Dr. Gibson focused on Michel's attention, concentration, and pace limitations. According to Michel, the ALJ should have incorporated "something about 'attention, concentration and pace' into the RFC finding" based on Dr. Gibson's opinion.

As the district court found, "[t]he ALJ . . . thoroughly addressed the consultative psychological examination of Michel performed by Dr. Gibson." (Footnote omitted.) The ALJ afforded Dr. Gibson's opinion "little weight" because "while [Michel] continually reported problems with concentration, none of her treating medical sources found any difficulties with concentration on examination (Exhibit 5F; 8F)." In support of the ALJ's finding of an inconsistency between Dr. Gibson's opinion and Michel's other "treating medical sources," the ALJ cited Exhibits 5F and 8F, which are

Michel's medical records from Amundsen and Dr. Odefey. The ALJ's "finding of inconsistency with other evidence alone is sufficient" for the ALJ to afford little weight to Dr. Gibson's opinion as to Michel's ability to concentrate. *See Goff*, 421 F.3d at 790–91.

### 5. *Conclusion*

We conclude that the ALJ properly considered and addressed the opinion evidence provided by Dr. Viner, Blankespoor, Dr. Isaac, and Dr. Gibson. We also find that the ALJ considered the medical evidence as a whole and made a proper RFC determination based on a fully and fairly developed record. As a result, we reject Michel's argument that the ALJ's RFC assessment is flawed and not supported by substantial evidence.

### B. *Impairments*

Michel argues that the ALJ erred in evaluating her impairment of chronic fatigue syndrome and fibromyalgia.

Michel suggests that her impairments are per se disabling. "We have previously recognized that fibromyalgia is a chronic condition which is difficult to diagnose and *may* be disabling . . . ." *Pirtle v. Astrue*, 479 F.3d 931, 935 (8th Cir. 2007) (citing *Garza v. Barnhart*, 397 F.3d 1087, 1089 (8th Cir. 2005) (per curiam)). We have never held that conditions such as fibromyalgia and chronic fatigue syndrome are per se disabling; "not every diagnosis of fibromyalgia warrants a finding that a claimant is disabled." *Perkins*, 648 F.3d at 900. "'While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability.'" *Id.* (quoting *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996)).

In the present case, "the ALJ properly found [Michel's] fibromyalgia [and chronic fatigue syndrome] to be . . . severe impairment[s] and took th[ose]

impairment[s] into account when determining [Michel's] RFC." *See Pirtle*, 479 F.3d at 935. We therefore find no err in the ALJ's consideration of Michel's impairments.

## C. *Hypothetical Question to VE*

Finally, Michel argues that the ALJ's hypothetical question to the VE was incomplete because it failed to properly account for all of her impairments. Michel also argues that the ALJ's hypothetical was incomplete for failing to include all of her functional limitations. An ALJ's hypothetical question to a VE "is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." *Perkins*, 648 F.3d at 901–02 (quotations and citations omitted). While "[t]he hypothetical question must capture the concrete consequences of the claimant's deficiencies," it need not include "any alleged impairments that [the ALJ] has properly rejected as untrue or unsubstantiated." *Id*. (quotation and citation omitted).

Here, as discussed *supra*, the ALJ's RFC was based on substantial evidence and took into account those impairments which were substantially supported by the record as a whole.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

MELLOY, Circuit Judge, dissenting.

I respectfully dissent. The ALJ did not provide good reasons for discounting the opinions of Michel's treating physician, Dr. Viner. Dr. Viner was Michel's primary care physician and saw Michel every 4 to 6 weeks for the past 10 years. Dr. Viner diagnosed Michel with disabling chronic fatigue and fibromyalgia. I would remand to the district court with directions to remand to the ALJ to reconsider Michel's application for disability insurance benefits after Dr. Viner's opinion is afforded proper weight.

We are obligated to give "controlling weight" to the opinion of a treating physician, like Dr. Viner, "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Gieseke v. Colvin, 770 F.3d 1186, 1188 (8th Cir. 2014) (quoting House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007)); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The majority emphasizes the exception to this rule that "a treating source does not receive controlling weight if the source's opinions are inconsistent, or inconsistent with other substantial evidence in the record." Blackburn v. Colvin, 761 F.3d 853, 860 (8th Cir. 2014) (citations omitted). In my view, our court too often broadly interprets this exception instead of giving proper deference to the treating physician's opinions.

In this case, the ALJ accorded "little weight" to Dr. Viner's opinions, in part, on the grounds that his opinions were "both internally inconsistent within [Dr. Viner's Residual Functional Capacity (RFC) Report] and externally inconsistent with [Dr. Viner's] prior treatment records." I find the ALJ relied on superficial and imagined inconsistencies to discount Dr. Viner's opinions.

First, according to the ALJ, Dr. Viner's opinions are inconsistent because his RFC form indicates Michel suffered pain in her feet, but his medical records do not. That is wrong. Dr. Viner's RFC form indicates that Michel experienced "bilateral" pain next to the category "[k]nees/ankles/feet." Dr. Viner did not specifically indicate that Michel had pain in her feet on his RFC form. While Dr. Viner's medical records do not refer to pain symptoms in Michel's feet, the record provides ample support that Michel suffered pain in her knees and ankles. Thus, the ALJ erred in finding an inconsistency based on the lack of a reference to pain in Michel's feet in the record.

Second, according to the ALJ, Dr. Viner's opinions are inconsistent because Dr. Viner reported that Michel was "unable to work"; however, Dr. Viner "failed to fill out any functional limitations resulting from her diagnosed impairments" on Dr.

Viner's RFC form. I disagree. Although Michel admits Dr. Viner's RFC form provides little information regarding her physical residual functional capacity, Dr. Viner's RFC form demonstrates Michel's physical limitations. Dr. Viner noted, for example, that during a typical eight-hour workday, Michel would "frequently" experience pain or other symptoms severe enough to interfere with her attention and concentration needed to perform even simple work tasks. Dr. Viner noted Michel has "daily and disabling" pain in her cervical spine, thoracic spine, shoulders, arms, hands/fingers, hips, legs, and knees/ankles/feet. Dr. Viner concluded that Michel is "incapable of even 'low stress' jobs," and he opined she has "prolonged disability." Dr. Viner's medical records also include objective evidence; observations regarding Michel's asthenic appearance; and Michel's subjective complaints as to her fatigue, general aching, inability to walk long distances, and limited activities, all of which describe Michel's impaired physical residual functional capacity.

Third, according to the majority, the "most glaring inconsistency" noted by the ALJ was Dr. Viner's statement that Michel's symptoms and limitations on the RFC form "applied to dates for the last '10 years.'" The ALJ found Dr. Viner's statement to be inconsistent with Michel's work history because Michel worked "until October 2009." I cannot agree. As the ALJ recognized, Michel's symptoms of fatigue date back to the early 1990s and were exacerbated in October of 2009. Therefore, Dr. Viner's indication on his RFC form that Michel's symptoms and limitations date back "10 years" is not inconsistent with the onset of Michel's disability in October of 2009. Even if Michel continued to work until her onset date of disability of October 22, 2009, in spite of her symptoms and limitations, there may have been other driving factors that permitted or required her continued employment. See Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998) (indicating that one's ability to work may be based on a lenient employer, a higher tolerance for pain, or no other means of support).

Lastly, according to the majority, the ALJ noted another inconsistency by asserting Dr. Viner's RFC report, but not his treatment notes, says Michel suffered

"'frequent' problems with attention and concentration." That is not what Dr. Viner's report says. Rather, it indicates: Michel's experience of pain or other symptoms is severe enough to frequently interfere with attention and concentration needed to perform even simple work tasks during a typical workday. Dr. Viner's treatment history and his RFC form focus on Michel's physical ailments. The ALJ misconstrues Dr. Viner's report to suggest Dr. Viner was opining as to Michel's mental capabilities. Yet again, the ALJ imagined an inconsistency to discredit Dr. Viner's opinions.[8]

Dr. Viner's opinions, based on a ten-year treatment history, were "well-supported by medically acceptable clinical and laboratory diagnostic techniques." Gieseke, 770 F.3d at 1188 (quoting House, 500 F.3d at 744). Further, physical therapist Dr. Mark Blankespoor administered an objective physical residual functional capacity test, finding that "[w]hile the client's capabilities are in the sedentary category, she would have significant difficulty with performing work tasks on a full-time basis." Dr. Blankespoor continued: "She would not be able to safely perform lifting, carrying, pushing, pulling, gripping, pinching, sitting, standing, walking, dexterity or positional tasks on a continuous, day after day basis." Dr. Viner did not express an opinion regarding Michel's physical residual functional capacity until after he reviewed Dr. Blankespoor's objective report. Thus, Dr. Viner's opinions deserve more credence because his opinions are supported not only by his own medical records but also by Dr. Blankespoor's report.

In conclusion, the ALJ was hard pressed to find "good reasons" for discrediting Dr. Viner's opinions. See Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008)

---

[8] It should also be noted the mental health records that the ALJ indicates are inconsistent with Dr. Viner's opinions are not as inconsistent as suggested. While the notes generally indicate: "Concentration: Good, Able to comment on events," they then usually go on to indicate: "Concentration: Unchanged, : good at times, memory still not what it should be . . ." However, other notes also indicate that on some visits concentration is "[i]mproved" while other occasions it is "[w]orse."

("Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight."); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The Social Security Administration and our court have an obligation to give due deference to the opinions of treating physicians and not ignore those opinions where only superficial or imagined inconsistencies exist. See Vossen v. Astrue, 612 F.3d 1011, 1017 (8th Cir. 2010) ("The opinion of a treating physician is accorded special deference under the social security regulations." (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000))). For the reasons discussed above, I would reverse and remand to the district court with instructions to remand to the ALJ for reconsideration of the weight given to Dr. Viner's opinions.

_____